UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>PAUL R. ROESSLER,<br><br>    Defendant. | NO. CR-12-063-LRS<br><br>**SECOND PRE-TRIAL ORDER** |

A second pre-trial conference was held on April 15, 2013 in Spokane to address various motions.

**I. DEFENDANT'S MOTION FOR RECONSIDERATION (ECF NO. 84)**

A motion for reconsideration can only be granted when a district court: (1) is presented with newly discovered evidence; or (2) committed clear error or the initial decision was manifestly unjust; or (3) there has been an intervening change in controlling law. *Dixon v. Wallowa County*, 336 F.3d 1013, 1022 (9th Cir. 2003).[1]

Defendant specifically challenges this court's conclusion that the

---

[1] The court assumes the same standard applies in both civil and criminal cases, even though the Federal Rules of Criminal Procedure do not contain a provision akin to Fed. R. Civ. P. 59(e).

**SECOND PRE-TRIAL ORDER-**    1

Spokane Airport Police Officers (Creek and McKinley) had reasonable suspicion to require Defendant to come into the executive airport terminal. (ECF No. 83 at pp. 2-5). In reaching this conclusion, the court considered the written materials offered by Defendant, in addition to the testimony elicited at the evidentiary hearing. The written materials included the police reports of Creek and McKinley. The arguments presented in Defendant's motion were based on what was set forth in those reports. The court addressed those arguments, specifically the significance of Officer Creek hearing "mushy" speech and Officer McKinley observing "constricted pupils." Obviously, Defendant's motion was filed before testimony was given at the suppression hearing.

On the night of April 26, 2012, TSOC Communications Center was advised by the Spokane Airport FAA Tower that it had lost communication with an aircraft which had "over shot" the Spokane Airport by approximately 50 miles. Communication with the aircraft was eventually regained and the aircraft landed at the airport. TSOC requested a "welfare check" of the pilot and so Officers Creek and McKinley were sent to contact the pilot. (ECF No. 49-1 at Ex. 1, p. 35). In his report, Officer Creek indicated that when he and Officer McKinley made contact with the pilot (the Defendant), "he was outside the airplane handing off cargo to couriers." Defendant explained what had happened (accidentally hit a switch that cut off the air traffic control frequency and got sidetracked studying for a flight check with his boss the following day). He denied using alcohol or drugs. (*Id*. at p. 37). According to Officer Creek's report:

> When he was speaking[,] his speech was mushy to me. Something that made me think he may have been drinking. I then told him I wanted to go inside XN Air Terminal to speak some more. He told me that he would and started doing things to avoid going in. I finally told him that I was losing my patience with him and that we needed to go inside. When we entered the building[,] he went

**SECOND PRE-TRIAL ORDER-    2**

> straight for the coffee. I felt that he may be trying to get to the coffee to mask the odor of alcohol. I told him that there would be no coffee. I could detect the odor of alcohol.

(*Id*.).

In her report, Officer McKinley indicated that while standing outside speaking to Defendant, she "observed that his pupils appeared constricted" and that "[o]nce we escorted [him] inside of the terminal, I smelled what I believed to be an intoxicating substance on his breath." (*Id*. at 38).

Officer Creek testified at the suppression hearing, but Officer McKinley did not. At the hearing, Officer Creek did not specifically mention that he heard "mushy" speech from Defendant while speaking to him outside on the tarmac near his aircraft. According to Officer Creek's testimony, he asked the Defendant "to go inside" and "after that he just started malingering around the plane doing various busywork like I was going to go away or something." (ECF No. 88 at p. 43). According to Creek, "it seemed like he [Defendant] was trying to avoid any contact with me." (*Id*.). Officer Creek thought "it was kind of odd" and noted that "at some point during that time, I'd asked him if he'd had any alcohol or drugs; he denied any usage." (*Id.*). Officer Creek did not notice anything regarding the Defendant's eyes because "it was dusk" and "the light conditions weren't necessarily the best." (*Id.*). Officer Creek said he wanted to go inside the executive terminal because it was windy outside, he was "not really full onboard as to what's going on," and he needed "to figure out why we had this incident occur." (*Id*. at p. 44). With the wind blowing, Creek testified he was unable "to do a personal-contact phase that we'd do, like, in a . . . DUI investigation" and so "I want[ed] to go inside and find out what more was going on." (*Id*.). Consistent with his report, Officer Creek testified that once inside the terminal, Defendant went "straight towards the coffee" (*Id*. at p. 47). Officer Creek told Defendant he could not have any coffee because he believed, based

**SECOND PRE-TRIAL ORDER-    3**

on his training and experience, that Defendant was trying to "mask for the odor of alcohol." (*Id*. at p. 49). Creek did not notice until he got inside the terminal that Defendant's eyes were "kind of pinpointed" and that there was an odor of alcohol on Defendant's breath. (*Id*. at pp. 56 and 57).

Officer Creek was asked whether when he talked to the Defendant he noticed anything about his speech. The officer answered in the affirmative and testified as follows: "I use the term that his speech was 'mushy'"[2] which is "like a thick tongue" and "not your normal speech you [hear] in most people." (*Id*. at p. 58); "[I]t's just . . . the mushy sound of somebody's tongue and mouth that are just not working completely in conjunction together." (*Id*.). It is not entirely clear here whether Officer Creek was referring to speech he heard from Defendant once they were inside the executive terminal, or if it was speech he heard outside of the terminal when he first encountered Defendant, or both. As noted above, in his suppression hearing testimony recounting the sequence of events, Officer Creek did not specifically mention hearing any "mushy" speech from the Defendant prior to directing him inside the executive terminal. Cross-examination of Officer Creek did not entirely clarify this, (*Id*. at 76-77), although Officer Creek did say it was "correct" that after they were in the terminal and he spoke to the Defendant, he noticed that Defendant had a "mushy" speech. (*Id*. at 80). Creek acknowledged he had not been dispatched to the airport to investigate the possibility of a "drunk flying," (*Id*. at 76) and instead been asked to check out the pilot for "medical issues." (*Id*. at 82).

---

[2] This is apparently a reference to use of this specific term in his police report. Officer Creek used his report to refresh his memory during the suppression hearing. (ECF No. 88 at p. 74).

**SECOND PRE-TRIAL ORDER-    4**

Reasonable suspicion exists when an officer is aware of specific articulable facts, that, together with rational inferences drawn from them, reasonably warrant a suspicion that the person to be detained has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416-18 (1981). When assessing the reasonableness of the police officer's actions, the court must consider the totality of the circumstances which confronted the officer at the time of the stop. *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581 (1989).  The articulable facts forming the basis of reasonable suspicion must be measured against an objective reasonableness standard, not by subjective impressions of a particular officer. *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1445 (9th Cir. 1994).  Although an officer may not base reasonable suspicion on a "hunch," he may "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available . . . that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744 (2002).  "Although an officer's reliance on a mere 'hunch' is insufficient to justify an investigatory stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id*. at 273-74.  The Government satisfies its "burden of production by coming forward with 'specific and articulable facts,' *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868 (1968) to support [an officer's] suspicion of illegal activity." *United States v. Willis*, 431 F.3d 709, 715 n. 5 (9th Cir. 2005). Defendant has the burden of proof on a motion to suppress, and as such, must "introduce contrary evidence or get the officer to retract his testimony on cross-examination." *Id*.

If there was no hearing of "mushy" speech and observation of constricted pupils by the airport police officers outside on the tarmac when they first encountered Defendant, the court concludes the officers nonetheless had

**SECOND PRE-TRIAL ORDER-    5**

reasonable suspicion to require Defendant to accompany them into the terminal for further questioning. In addition to having knowledge that the Defendant had overshot the airport by 50 miles and had lost communication with the airport tower for a significant period of time, Officer Creek testified the Defendant engaged in behavior indicating he was attempting to ignore and avoid complying with the officers' request that he accompany them into the terminal. Considering that Defendant had just landed his aircraft after having overshot the airport by 50 miles and been out of communication with the tower for a significant period of time, he was not entitled "to ignore the police and go about his business." *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319 (1983). Officer Creek had more than a mere "hunch" of illegal activity. He had "specific and articulable facts" giving rise to reasonable suspicion that one possibility the Defendant had overshot the airport and lost communication with the tower was because he had engaged in illegal activity, namely flying while under the influence of alcohol or drugs. This reasonable suspicion was confirmed by what transpired thereafter in the terminal giving rise to probable cause for the arrest of Defendant by Trooper Wynecoop.

The court did not commit a clear error in denying Defendant's Motion To Suppress and that decision is not manifestly unjust. Accordingly, Defendant's Motion For Reconsideration (ECF No. 84) is **DENIED**.

**II. MOTIONS IN LIMINE**

For reasons given in open court at the first pre-trial conference and based on the Government's response (ECF No. 86), Defendant's Second Motion In Limine (ECF No. 78) is **DISMISSED** as moot.

For the reasons given in open court at the second pre-trial conference, the Government's Sealed Motion In Limine (ECF No. 95) is **GRANTED** and barring an offer of proof outside the presence of the jury which persuades the

**SECOND PRE-TRIAL ORDER-** 6

court otherwise, Defendant will offer no argument or evidence at trial regarding the matter that is the subject of the Government's Sealed Motion In Limine.

## III. WITNESS LIST

The Government shall provide Defendant's counsel with a witness list by 5 p.m. on April 17, 2013.

**IT IS SO ORDERED.** The District Executive shall forward copies of this order to counsel of record.

**DATED** this __16th__ of April, 2013.

          **s/Lonny R. Suko**
          LONNY R. SUKO
          United States District Judge

**SECOND PRE-TRIAL ORDER-    7**